**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.: _____

LUVI DYE, an individual,
    Plaintiff,

  v.

INTERNATIONAL BUSINESS MACHINES
CORPORATION, a New York corporation; and
KELLY BROOKS, an individual,

    Defendants.

_____

**ORIGINAL COMPLAINT FOR DAMAGES AND JURY DEMAND**
_____

Plaintiff Luvi Dye, through her undersigned counsel, THE ANTHONY A. GARCIA LAW FIRM, for her Complaint against Defendants, hereby makes the following allegations:

I.

NATURE OF THE ACTION

1.    This is an employment discrimination action brought by Plaintiff Luvi Dye pursuant to the Age Discrimination in Employment Act ("***ADEA***"). Dye had been an IBM employee in various management positions for over thirty years. However, as noted in the results of an EEOC investigation involving numerous charges of age discrimination at IBM, higher-level management at IBM secretly directed its junior managers to terminate older employees to make room for younger employees. Dye was one of those employees targeted for termination. Despite performing her job exceedingly well for her entire time at IBM, Dye's troubles began when her immediate superior left IBM. The supervisory role was ultimately replaced by Brooks who, in

1

accordance with IBM's unlawful mandate to terminate older employees, arbitrarily rated Dye as "needing improvement" on various tasks and on Dye's annual performance review.  Brooks' negative ratings were the pretextual reasons IBM used to terminate Dye, precipitating this lawsuit.

II.

PARTIES

2.	Defendant International Business Machines Corporation ("**IBM**") is a corporation organized under the laws of the State of New York, with corporate headquarters at 1 Old Orchard Road, Armonk, New York.  IBM currently maintains offices and operates out of 6300 Diagonal Highway, Boulder, CO 80301.  IBM's registered agent in the State of Colorado is C T Corporation System, located at 7700 E Arapahoe Road, Suite 220, Centennial, CO 80112-1268.

3.	IBM is an "employer" because it is engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.  29 U.S.C. §§ 630(b) and (h).

4.	Defendant Kelly Brooks ("**Brooks**") is an individual who is believed to reside in the State of Colorado.

5.	Brooks is an "employer" within the meaning of the ADEA because at all relevant times she was an agent of IBM. 29 U.S.C. § 630(b).

6.	Plaintiff Luvi Dye ("**Dye**") is an individual citizen and resident of the State of Colorado.

7.      Dye is an "employee" protected by the ADEA, 29 U.S.C. § 631(a), in that at all relevant times, Dye was over the age of 40, was a citizen or lawful resident of the United States, and was employed by IBM in Boulder, Colorado. 29 U.S.C. § 630(f).

III.

JURISDICTION AND VENUE

8.      Pursuant to 28 U.S.C. § 1331, the Court has federal question subject matter jurisdiction over Dye's ADEA claims because the claims arise under Title 29 of the U.S. Code.

9.      This Court has general personal jurisdiction over Defendant IBM because IBM's contacts with the State of Colorado are so continuous and systematic that this Court may exercise personal jurisdiction over the IBM.  As noted above, IBM currently maintains offices and operates its business in Colorado.

10.     Upon information and belief, the Court also has general jurisdiction over Defendant Brooks because she resides within the State of Colorado, and her contacts with the State of Colorado are so continuous and systematic that this Court may exercise personal jurisdiction over her.

11.     Alternatively, this Court has specific personal jurisdiction over all Defendants because the causes of action described below arose from the consequences of Defendants' activities within the State of Colorado.  Defendants' discrimination occurred within the State of Colorado against Dye, a Colorado citizen, and the consequences of Defendants' misconduct are so substantially connected to Colorado that the exercise of jurisdiction is reasonable, and it does not offend traditional notions of fair play and substantial justice.  Defendants purposefully availed themselves of the laws of the State of Colorado by virtue of their business operations within

Colorado, and it can be reasonably presumed that Defendants expected they may be haled into Court in Colorado.

12. Venue is proper in the U.S. District Court for the District of Colorado under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Dye's claims occurred in Colorado.

13. Dye has exhausted her administrative remedies in pursuit of her claims. She initially filed a Charge of Discrimination with the Colorado Civil Rights Division and the U.S. Equal Employment Opportunity Commission ("*EEOC*"), Charge No. 541-2015-01642, and she was issued her Notice of Right to Sue letter on July 19, 2021 (attached hereto and incorporated herein as **Exhibit A**). Hence, her commencement of this action is proper and timely.

IV.

GENERAL FACTUAL ALLEGATIONS

14. IBM is an international company that has historically sold various office hardware, software, and services.

15. To determine whether its employees are performing their duties satisfactorily, IBM conducts periodic reviews of employees' job performance, ranking employees on a 1 - 3 scale,[1] with a score of "1" being the highest rating an employee can receive (*i.e.* extraordinary), a score of "2+" being the next lowest score (*i.e.* "exceeds"), a score of "2" being the next lowest score (*i.e.*

---

[1] Prior to around 1987 or 1989 IBM originally had an equivalent 1-4 scale, in which the "1" was the best score (*i.e.* extraordinary) and "4" was the worst (*i.e.* needs improvement).

4

"satisfactory"), and a score of "3" being the worst score (*i.e.* "needs improvement") (collectively, the "***Performance Ratings***").

16. During Dye's time at IBM, whenever an employee wished to obtain a new position or role within IBM, the employee would need to apply for, and be hired for, the new role.

17. Dye was hired by IBM in June of 1978, at age 27, as a Manufacturing Assembler assembling IBM's copiers.

18. In or about 1982 Dye became a "Department Technician," which was a managerial role equivalent to the "Team Lead" managerial position she would later earn. Thereafter, due to Dye's skills as a manager, she would continue to apply for and obtain management roles throughout IBM until her termination.

19. In or about 1987, IBM moved its manufacturing operations to Charlotte, NC. As a result, Dye's manufacturing team was disbanded and encouraged to apply for other positions throughout IBM. Dye applied for and was hired to IBM's "Recon" line, but eventually that position was also dissolved as IBM restructured its business.

20. After that position, Dye applied for and was hired to work as a Technical Services Team Lead for IBM's Procurement Purchasing Department.

21. The Procurement Purchasing Department had approximately 10 people for Dye to oversee, some of which were ex-IBM managers. Dye's team was constantly issuing RFQs (Requests for Quotes) and placing large orders for various office products for IBM. At the time Dye was responsible for managing 40,000 publication numbers that were placed on the back of

IBM's various manuals and booklets and published, a project that required considerable organization and management skills.

22. As an example of IBM's trust in Dye's abilities as a manager, IBM tasked her with traveling to Ireland and training IBM's entire procurement department for Ireland by herself, which she did successfully.

23. After her experience in Ireland, in 2009 (when she was over the age of 55) Dye applied for and was hired for a job at IBM as Team Lead for Technical Services for IBM's Healthnet account.

24. From about 2009 until early 2014, Dye's First Line Manager (*i.e.* her immediate superior) was Kent Welp ("*Welp*").

25. Welp left IBM in or around January of 2014, and his position was replaced several times between the in the months that followed. The replacing managers included Tanya Weitzel ("*Weitzel*"), Scott Schumacher ("*Schumacher*"), Leslie Lincoln ("*Lincoln*"), and Brooks. Weitzel was an existing IBM employee and was the first of Welp's replacements.

26. Upon information and belief, at some time around Welp's departure IBM's management developed an unlawful objective of terminating Dye because of her age and replacing her with a younger individual. Upon information and belief, Brooks specifically agreed to comply with IBM's unlawful objective and worked to do so.

27. According to IBM's own policies, a pre-requisite for termination is a Performance Rating of "3" (*i.e.* needs improvement). Hence, to give the appearance of a legitimate employment

6

termination and avoid liability for their unlawful conduct, IBM and Brooks worked to ensure that Dye was given a poor Performance Rating to pretextually justify her termination.

28.     Upon information and belief, in or about February 2014 Weitzel specifically called two other IBM employees into her office and told them that Weitzel was going to "get rid of Dye."

29.     Indeed, the EEOC conducted an extensive investigation regarding 58 charges of employees age-discrimination (including Dye's charge) at IBM that occurred between the years of 2013 and 2018.  The EEOC's investigation

> uncovered top-down messaging from [IBM]'s highest ranks directing managers to engage in an aggressive approach to significantly reduce the headcount of <u>older</u> workers to make room for Early Professional Hires. Analysis shows it was primarily older workers (85.85%) in the total potential pool of those considered for layoff.  Evidence uncovered older employees who were laid off and told that their skills were out of date, only to be brought back as contract workers, at a lower rate of pay with fewer benefits.  EEOC received corroborating testimony from dozens of witnesses nationwide <u>*supporting a discriminatory animus based on age*</u>.  Based on the above, [IBM]'s asserted defense does not withstand scrutiny and the Commission has determined that there is reasonable cause to believe that [IBM] has discriminated against [Dye] and others on account of their age. (emphasis added).

30.     In or about May of 2014, Weitzel left IBM, and Schumacher replaced Weitzel. Weitzel was not Dye's manager for long enough to provide a meaningful assessment.

31.     Schumacher was primarily a First Line Manager in another department of IBM managing a different account who was brought in to oversee the Healthnet account in the interim until a suitable replacement could be found.  Schumacher did not know much about IBM's Healthnet account, and during this interim period Schumacher rarely left his office, provided any assistance to Dye and others only when asked, and largely allowed Schumacher's Second Line

Manager (*i.e.* his direct superior), Lincoln, to perform the First Line Manager duties for the Healthnet account.

32. Eventually, after a short time, Schumacher left the First Line Manager position on the Healthnet account to return to his own team. At that point Lincoln assumed the duties of the First Line Manager on the Healthnet account until Brooks, another existing IBM employee, was hired for the position on or about July 28, 2014.

33. In keeping with the IBM's objective to wrongfully terminate Dye on the basis of her age, Brooks almost immediately began to set the groundwork for terminating Dye.

34. In or about July 2014 Dye and other Team Leads were tasked with generating a "BCI," an acronym for a document titled, "Building Continual Improvement," which was a report on how Dye planned to improve her performance. Dye was informed the BCI was not due until October 2014.

35. However, well before the BCI was due, Schumacher informed Dye (even though Brooks was Dye's superior at the time) that the First Line Managers and possibly Lincoln collectively held a meeting where it was determined that Dye received a "3" (*i.e.* the worst possible score) for that assignment. Schumacher indicated that, even though Dye had not missed the October deadline for the BCI, her score of "3" was a result of Dye (allegedly) being the last Team Lead to submit their BCI.

36. Dye's Performance Reviews from 1978 through early 2014 consistently rated Dye's job performance as "extraordinary" or "exceeding" expectations.

37. The arbitrary "3" rating for the BCI assignment was the first such rating Dye had received in her entire career at IBM. Any assessment that Dye's performance actually "needed improvement" is belied by the evidence: for example, on or about July 24, 2014 Dye's team received an email from Bobby Shaw ("*Shaw*"), the Delivery Project Executive of IBM's HealthNet account, on which several IBM managers were copied, in which Shaw acknowledged Dye's team for outstanding demonstration of the three components IBM believes is necessary to be successful on the HealthNet account: (1) Operational Excellence, (2) High Performance Team, and (3) Account Objectives Rule.

38. In reality, Dye's team was outperforming the other First Line Managers; Schumacher would occasionally ask Dye for assistance with his team. If Dye's performance truly "needed improvement," it is unlikely that Schumacher would have reached out to Dye for assistance.

39. In any event, the harassment against Dye continued.

40. Brooks then began giving Dye tasks with short deadlines that would be impossible to complete without working overtime, knowing that Dye was not authorized to work overtime and thus would be unable to complete those tasks. Brooks would also instruct other IBM employees not to assist Dye in any way with those tasks.

41. For example, in at least one instance on a Friday afternoon in or about August 2014, Brooks ordered Dye to complete various tasks by the following Monday. To accomplish these tasks by Brooks' deadline and without assistance from others, Dye was forced to work on the weekend and work a number of overtime hours that Dye did not actually report or claim. When

Dye nevertheless completed the task on time, Brooks deduced that Dye had been working overtime without claiming overtime hours. As a result, Brooks asserted that Dye had been insubordinate.

42. On or about August 18, 2014, after only one month of becoming Dye's First Line Manager, Brooks contacted Jayme Crowe, IBM's Human Resource Partner, for guidance on "performance managing Ms. Dye." IBM asserts this was because Dye allegedly had unauthorized overtime hours and allegedly failed to properly analyze and correct her team's failures on their Missed Service Report in August of 2014.

43. Additionally, because Dye's husband was critically ill from a serious health condition (which he ultimately died from), in or about August 2014 Dye had requested to work from home two days a week to lessen the possibility of bringing home contagions that could harm her husband while balancing her obligation to appear in person for work. IBM, through Brooks, denied Dye's request on or about August 20, 2014 and instead issued a verbal warning for allegedly being insubordinate.

44. On or about August 20, 2014, Brooks placed Dye on what IBM calls a 30-day verbal warning of Conditions of Employment for alleged insubordination, and Dye was offered a "separation package," which Dye declined.

45. On or about August 26, 2014, Dye filed an internal complaint through IBM's "Open Door" process against Brooks. In the complaint, Dye expressed feelings of age-based discrimination and harassment from Brooks. Dye noted that she feared Brooks would interfere with her job security.

46.     Less than a week later, in an unsurprising and self-serving maneuver, IBM ruled that Dye's internal complaint was unsubstantiated.

47.     In or about October 2014, Dye felt she had no other option but to transfer out of her department into IBM's Operations Team in an attempt to avoid working under Brooks. Dye submitted an application for that role *and was hired*. In Dye's new position, her immediate supervisor was Aniesto Rojas ("***Rojas***") until he retired in February of 2015.

48.     In or around January 2015, Brooks gave Dye a Performance Rating of "3" for Dye's year-end evaluation even though Dye no longer worked under Brooks and had not worked under her for at least three months. Rojas had made positive comments about Dye for his portion of Dye's review.

49.     Dye's Performance Rating of "3" was unjustified and, consistent with the EEOC's findings, was simply a means of providing the groundwork for a pretextual termination of Dye.

50.     On or about January 27, 2015, Dye was informed she would be dismissed from her employment at IBM due to her allegedly "low" performance rating as part of a reduction in force. Her dismissal date was set for May 31, 2015.

51.     On April 2, 2015, Dye filed another Open-Door internal complaint alleging retaliation for raising an age-discrimination claim. IBM once again investigated her claims by "speaking with her managers." Shortly thereafter, in self-serving fashion, IBM found her claims unsubstantiated.

52. IBM admits Brooks provided the majority of input into Dye's year-end performance. IBM also claims the report of Dye's overtime hours was the another determining factor of her dismissal, along with a "failure to achieve her goals" between the dates of July 17, 2014 and August 18, 2014.

53. Clearly, IBM's own determinations regarding Dye's Open-Door complaints were not aimed at actually investigating whether Dye was being discriminated against based upon her age.

54. Dye's wrongful discharge by the IBM Corporation has directly and proximately caused Dye damages, including, but not limited to, the loss of her reputation, humiliation, damages from not being able to find work due to the dismissal, sale of valuable personal property necessary to sustain herself, pain and suffering from the stress of being falsely discharged, emotional disturbance, and her attorney's fees and costs.

55. Defendant's actions in wrongfully discharging Dye were willful and wanton and unnecessary.

56. Dye began the process of filing a charge of discrimination through the EEOC and through the Colorado Civil Rights Division in or about June 2015.

57. Under 29 U.S.C. § 626(f)(1), an employer implementing a group termination must provide information relating to the job titles and ages of those selected for termination and the corresponding information relating to the employees in the same job titles who were not selected for termination.

58. Review of the 29 U.S.C. § 626(f)(1) information in this case shows that Dye was the oldest employee in her team at the age of 64 during her dismissal, while the average age of the retained workers in her group was significantly lower at 49 years old. All employees who were dismissed along with Dye were over the age of 47 years old.

V.

CLAIMS FOR RELIEF

**AS A FIRST CLAIM FOR RELIEF**
(Violation of the ADEA, 29 U.S.C. § 623(a) – All Defendants)

59. Dye realleges and reasserts each and every preceding allegation in this Complaint as if fully set forth herein.

60. IBM is engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year. Hence, for purposes of the ADEA, IBM was Dye's "employer."

61. Brooks, at all relevant times, was an agent of IBM and participated directly in the discrimination against Dye. Brooks is therefore also considered to be Dye's "employer" for purposes of the ADEA.

62. Dye, at all relevant times, was in a protected age group because she was over 40 years of age at the time Defendants discriminated against her.

63. At all relevant times Dye was performing her job satisfactorily, despite Defendants' assertions to the contrary.

64. Dye was discharged, and, upon information and belief, her position was filled by a younger person.

65. As described more particularly above, Defendants discharged and otherwise discriminated against Dye with respect to her terms, conditions, or privileges of employment, because of Dye's age.

66. Defendants' termination of Dye was not reasonably necessary to satisfy bona fide occupational qualifications and was not based on reasonable factors other than age; in fact, Dye's performance consistently met or exceeded expectations for the decades that she worked for IBM up through the time of her termination, she was hired for another position at IBM shortly before she was fired, and the ostensible reasons IBM provided for her termination were a pretext for IBM discrimination against Dye on the basis of her age.

67. By the conduct described above, Defendants intentionally violated Dye's rights as was secured by the ADEA.

68. Dye's age was the "but for" motivating factor that prompted IBM to take this action; in other words, IBM would not have terminated Dye but for her age.

69. IBM willfully violated the ADEA in terminating Dye.

70. As a direct and proximate result of the violations of Dye's ADEA rights, Dye was terminated from gainful employment by IBM and suffered actual damages in the form of, *inter alia*, lost wages, lost benefits, loss of earning capacity, loss of career opportunities, expenses

incurred in obtaining alternate income and in other respects, and mental and emotional suffering, in an amount to be proven at trial.

WHEREFORE, Dye respectfully requests the relief prayed for at the conclusion of this Complaint.

**AS A SECOND CLAIM FOR RELIEF**
(Violation of the ADEA, 29 U.S.C. § 623(d) – All Defendants)

71. Dye realleges and reasserts each and every preceding allegation in this Complaint as if fully set forth herein.

72. Dye opposed Defendants' unlawful age discrimination by filing internal Open-Door complaints before materially adverse action was taken against her. Dye's act of filing such internal complaints was a protected activity under the ADEA.

73. Dye suffered material adverse action when she was harassed, effectively forced to change positions within IBM, and when she was terminated by Defendants.

74. There is a causal connection between Dye's protected activity of reporting Defendants' age discrimination and the material adverse action against Dye.

75. As a direct and proximate result of the violations of Dye's ADEA rights, Dye was terminated from gainful employment by IBM and suffered actual damages in the form of, *inter alia*, lost wages, lost benefits, loss of earning capacity, loss of career opportunities, expenses incurred in obtaining alternate income and in other respects, and mental and emotional suffering, in an amount to be proven at trial.

WHEREFORE, Dye respectfully requests the relief prayed for at the conclusion of this Complaint.

## VI.

## PRAYER FOR RELIEF

Dye respectfully prays that this Court enter its Judgment awarding her the following relief against IBM:

a. Compensatory, consequential, and incidental damages in an amount to be proven at trial;

b. Exemplary damages;

c. Dye's attorney's fees and costs, including expert witness fees, if any;

d. Pre- and post-judgment interest on all damages awarded; and

e. Such other and further relief this Court deems just and proper.

## VII.

## JURY TRIAL DEMAND

Dye hereby respectfully requests a jury decide all issues so triable.

DATED: September 20, 2021

Respectfully submitted,

THE ANTHONY A. GARCIA LAW FIRM

By: /s/ Anthony A. Garcia
Anthony A. Garcia, Esq., #49481
1624 Market Street, Suite 202
PMB 92855
Denver, CO 80202
Tel: (720) 593-9427
agarcia@agarcialegal.com
*Attorney for the Plaintiff*